IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL ACTION** |
| v. | NO. 20-298-KSM |
| **STACY GALLMAN** | |

## MEMORANDUM

**MARSTON, J.**                                                                                              June 3, 2021

Defendant Stacy Gallman ("Defendant") has been charged with possession of a firearm loaded with eleven rounds of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) following a traffic stop on the 2800 block of Huntingdon Street in Philadelphia, Pennsylvania. (Doc. No. 1.) He now moves to suppress the evidence of the loaded firearm and an additional magazine containing rounds of ammunition seized following the stop.[1] (Doc. Nos. 22 & 30.)

On May 11, 2021, the Court held an evidentiary hearing on Defendant's motion to suppress. (*See* Doc. No. 31.) During the hearing, Philadelphia Police Department Officers Joshua Kling, Thomas Nestel, and Jesse Rosinski testified.[2] Body camera footage and still shots

---

[1] Defendant moves to suppress "all evidence seized by law enforcement as a result of the December 27, 2019 traffic stop," yet only specifically discusses the loaded firearm seized from the driver's side door and the magazine recovered from the back of the patrol car where Defendant was detained during the traffic stop. (Doc. No. 22 at pp. 1, 14.) At the suppression hearing, there was testimony that additional rounds of ammunition were found in the vehicle's center console and that marijuana was recovered from the back seat of the vehicle. (Hr'g Tr. at 39:8–12, 74:20–21.) As neither Defendant's motion nor supplemental filing addresses the suppression of these items, and the government has not indicated whether it seeks to admit these items as evidence at trial, the Court does not decide at this time whether these items were illegally seized.

[2] At the hearing, the government informed the Court that there was an open Internal Affairs Division ("IAD") investigation of Officer Rosinski allegedly involving an improper traffic stop. (Hr'g Tr. at 4:23–10:22.) The government reported that Officer Rosinski's understanding was that the investigation had been closed (*see id.*), and Officer Rosinski subsequently testified that he did not know the outcome of this

of the traffic stop were introduced into evidence.

For the reasons discussed below, the Court denies Defendant's motion.

I.      **Factual Background**

On the evening of December 27, 2019, Officers Kling and Nestel were on tactical patrol in the 22nd District[3] in their marked patrol vehicle, a Ford Explorer SUV. (*See id.* at 13:11–15:7.) At approximately 7:15 p.m., Officer Kling was driving northbound on the 2500 block of North 25th Street when he noticed a vehicle pull out in front of his police SUV. (*Id.* at 15:15–20.) At the intersection of 25th Street and West Huntingdon, Officer Kling observed the vehicle slow down, but not fully stop at the stop sign, which is a violation of the Pennsylvania Motor Vehicle Code. (*Id.* at 15:21–23, 18:6–12; Gov't Exs. 1–3.)

Officer Kling then followed the vehicle onto West Huntingdon Street and asked Officer Nestel to run the vehicle information through the computer terminal system. (Hr'g Tr. at 15:23–16:1, 18:14–20, 19:1–9.) When Officer Nestel ran the license plate number through the system, nothing came back for the vehicle. (*Id.* at 19:4–11.) Officer Kling testified that this indicated that "either the tag is not associated with that vehicle, it's a dead tag, or . . . the vehicle [is] in temporary registration status." (*Id.* at 19:12–18.) Officer Kling did not think the vehicle was in

---

IAD investigation and was unaware of any open IAD investigations. (*id.* at 116:16–117:3, 118:18–119:10). The Court agreed to leave the record open to allow Defendant the opportunity to cross examine Officer Rosinski about the results of the IAD investigation once they were disclosed. (*Id.* at 9:10–10:15.) On June 2, 2021, the government notified Defendant that the IAD investigation of Officer Rosinski remains open.

The government does not know when Officer Rosinski's IAD investigation will be completed, and trial in this matter is set to begin on June 15, 2021. (Doc. Nos. 25, 27.) Although the Court denies Defendant's motion to suppress on the record before it, Defendant may file a motion for reconsideration if Defendant believes additional questioning of Officer Rosinski is needed.

[3] The 22nd District runs from 10th Street to the Schuylkill River, and Poplar Drive to Lehigh Avenue. (Hr'g Tr. at 14:5–8.)

temporary status as Officer Kling did not see a half sheet of paper that is normally placed in the rear window of a vehicle that is in temporary status. (*Id.* at 19:15–20:2.)

After Officer Kling reached the 2800 block of Huntingdon, he activated his lights and sirens. (*Id.* at 20:3–6.) The driver, later identified as Defendant Stacy Gallman, immediately pulled over to the side of the road.[4] (*See id.* at 20:3–6, 22:8–12; Gov't Ex. 2.) Officer Kling stopped, and, prior to approaching Defendant's vehicle, Officer Kling turned on the SUV's side spotlight and the white bright light on the light bar in order to illuminate Defendant's vehicle. (Hr'g Tr. at 22:13–17, 22:23–24.)

Officer Kling observed that there were two individuals in the vehicle, the driver and a front seat passenger, subsequently identified as Nafese Kelly-Sizer.[5] (*Id.* at 22:21–24:2.) As Officer Kling exited his vehicle, he turned on his body camera[6] and noticed Defendant turn his shoulders to the left and reach his right hand across his body. (*Id.* at 22:21–23:9.) At the same time, Officer Kling saw the passenger moving around and looking over his shoulder at the officers. (*Id.* at 22:24–24:2.)

---

[4] During the course of Officer Kling's five-and-a-half years of experience in the 22nd District, he has responded to at least a half a dozen homicides and shootings in a three-block radius of that location, and "[m]any, many more" calls that involved a gun. (*Id.* at 20:19–22:7.) Additionally, Officer Kling recalled an incident in which a police officer was shot at during a traffic stop in the same general area. (*Id.* at 63:10–25.) Similarly, Officer Nestel testified that the "general area" in which he and Officer Kling pulled over Defendant "is one of the worst areas in the district." (*Id.* at 89:13–16.) In Officer Nestel's four years as an officer in the 22nd District, "there have been multiple shootings, homicides" in the area, and Officer Nestel has "been personally involved in gun arrests and narcotics arrests in the area." (*Id.* at 89:17–18.)

[5] Kelly-Sizer, who is charged in a separate indictment with being a convicted felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1), also moved to suppress the evidence seized from his person during this traffic stop. The Court denied the motion to suppress. *See generally United States v. Kelly-Sizer*, Criminal Action No. 20-297-KSM, 2021 WL 1293563 (E.D. Pa. Apr. 6, 2021).

[6] Although Officer Kling believed he had fully activated his body camera as he exited the police vehicle, he later realized it "wasn't blinking red" indicating that it was activated, and therefore, he "immediately turned it on." (*Id.* at 43:13–18; *see also id.* at 46:23–47:9.)

Officer Nestel also exited the SUV and walked towards the passenger side of the vehicle. As Officer Nestel approached he saw the passenger "slide down to the right and duck his shoulder and right arm towards the right lower side of the vehicle." (*Id.* at 88:18–22.) This concerned Officer Nestel, who testified that in his experience, "people that make movements like that are generally trying to place something beneath the seat of the vehicle." (*Id.* at 89:2–12.)

Meanwhile Officer Kling reached the driver's side door and asked Defendant to provide his license, registration, and proof of insurance. (*Id.* at 25:10–14.) Officer Kling also asked whether anyone in the vehicle had a permit to carry a firearm or if there were any weapons in the vehicle.[7] (*Id.* at 22:10–14.) In response Defendant said "Why?" (*Id.* at 26:2–5; *see also id.* at 93:20–23.) This response was unexpected and raised Officer Kling's level of concern for his safety, because although Officer Kling routinely asks this question during vehicle stops, he has never had someone respond with anything other than a "yes" or "no" during his past four years as a patrol officer. (*Id.* at 26:6–21; *see also id.* at 79:24–80:6.)

While Officer Kling was interacting with Defendant, his partner Officer Nestel was having a conversation with the passenger, Kelly-Sizer. (*Id.* at 27:1–2; *see id.* at 90:18–21.) Officer Nestel asked Kelly-Sizer whether he had a firearm or a permit to carry one; Kelly-Sizer stated no. (*Id.* at 90:18–21, 94:3–8.) Officer Nestel did not believe Kelly-Sizer as he saw the symbol for the Glock firearm manufacturer on what appeared to be a magazine in the small slit pocket on Kelly-Sizer's pants. (*See id.* at 90:7–17, 91:3–5.) Officer Nestel immediately alerted Officer Kling that he believed Kelly-Sizer possessed a firearm by calling out their firearm "code word." (*Id.* at 90:22–91:2, 27:14–21.) Officer Nestel then grabbed Kelly-Sizer's hands and

---

[7] Officer Kling testified he asks this question as a matter of course during vehicle stops as he believes that it helps to prevent the stop from "accidentally escalat[ing] if someone in the vehicle does have a permit to carry." (*Id.* at 25:15–21.)

4

pulled him out of the car. (*Id.* at 90:22–91:2, 91:7–9; *see also id.* at 27:3–7, 27:14–21.) When Officer Nestel pulled Kelly-Sizer from the car, Officer Kling saw a firearm in Kelly-Sizer's waistband area and told Officer Nestel, "it's in his waistband." (*Id.* at 27:7–13, 91:15–19.) Officer Nestel recovered a loaded firearm and a loaded Glock magazine from Kelly-Sizer's person. (*Id.* at 91:12–14, 91:20–22.)

As Officer Nestel recovered the firearm and magazine from Kelly-Sizer, Officer Kling asked Defendant to step out of the vehicle. Officer Kling conducted a quick pat-down search[8] and placed Defendant in handcuffs. Officer Kling then passed Defendant to a backup officer, Officer Rosinski, who placed Defendant in the back of his patrol car. (*Id.* at 28:16–25; *see also id.* at 112:3–8.) Officer Kling then returned to the driver's side of Defendant's vehicle. Officer Kling looked down at the open driver's side door and immediately saw a firearm resting between the driver's seat and the vehicle's B column.[9] (*Id.* at 29:1–30:1.) Officer Kling seized the firearm, a Glock, model 30, .45-caliber firearm loaded with 11 rounds of ammunition. (*Id.* at 29:17–19; 39:1–2.)

Shortly after Officer Kling recovered the Glock from Defendant's driver's side door area, Officer Rosinski discovered another Glock magazine loaded with 13 rounds of .45-caliber ammunition near where Defendant was sitting in the backseat of Officer Rosinski's patrol vehicle. (*See id.* at 113:24–115:11; *see also id.* at 38:1–3, 39:3–7, 96:20–97:2.) The magazine was not there when Officer Rosinski put Defendant in the backseat. (*See id.* at 112:11–113:21.) Subsequently, officers also discovered an additional 7 rounds of .45-caliber ammunition in a

---

[8] Officer Kling testified that his initial search of Defendant was "an open palm frisk only for weapons," during which he "didn't go into [Defendant's] pockets." (*Id.* at 50:5–10.)

[9] Officer Kling testified that the "B column" is where the driver's "seat belt would be attached to." (*Id.* at 29:15–17.)

sandwich baggie in the center console of Defendant's vehicle and marijuana in the back seat. (*See id.* at 39:8–12, 74:20–21.))

## II. The Parties' Arguments

In his motion, Defendant argues that the officers lacked probable cause to stop his vehicle, search it, and arrest him, and that the firearm and additional magazine should be suppressed as a result. (Doc. No. 22 at p. 2.) Defendant reiterates these arguments in his supplemental memorandum of law in support of his motion (*see* Doc. No. 31 at p. 1), though in that filing he focuses primarily on the officers' decision to remove him from the vehicle and search it, arguing that they lacked reasonable suspicion or probable cause that he had committed any crime at the time they removed him from the vehicle (*id.* at pp. 2–10).

In response, the government argues that the officers had reasonable suspicion to conduct the stop because Defendant failed to fully stop at a stop sign, a violation of the Motor Vehicle Code, and that the officers had reasonable suspicion to believe that Defendant was armed based on the circumstances of stop and, in particular, the magazine and firearm recovered from Defendant's passenger. (Doc. No. 24 at pp. 5–8; Doc. No. 31 at pp. 2–5.) Additionally, the government argues that Officer Kling legally recovered the firearm from the driver's seat area because it was in plain view. (Doc. No. 24 at pp. 8–10; Doc. No. 31 at pp. 5–6.)

## III. Standard of Review

As a general matter, a defendant who moves to suppress evidence bears the burden of proof. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.*; *see also United States v. Cole*, 425 F. Supp. 3d 468, 484 (W.D. Pa. 2019) ("The defendant's

burden is easily satisfied when law enforcement conducted the challenged search or seizure without a warrant."). The government must satisfy its burden of proof by a preponderance of the evidence. *See, e.g.*, *Cole*, 425 F. Supp. 3d at 484.

IV.     **Discussion**

   *A. The Stop*

Although Defendant provides no argument in his supplemental memorandum as to why the Court should disregard the uncontroverted testimony that he ran a stop sign and was driving an unregistered car (*see* Doc. No. 30 at pp. 5–6), he nonetheless maintains that the "officers lacked reasonable suspicion to stop [his] vehicle" (*id.* at p. 1). Therefore, the Court preliminarily considers whether the initial stop was lawful. It was.

The Fourth Amendment protects people against unreasonable searches and seizures. U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)). It is well-settled that a traffic stop is a "seizure" under the Fourth Amendment. *See, e.g.*, *United States v. Johnson*, 452 F. App'x 219, 225 (3d Cir. 2011). As the Third Circuit has explained, the Supreme Court established a "bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for the investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)). The reasonable suspicion standard applies to routine traffic stops. *Johnson*, 452 F. App'x at 225.

Because "*any* technical violation of a traffic code legitimizes a stop," *Mosley*, 454 F.3d 252 (emphasis added) and failure to make a complete stop at a stop sign is a violation of 75 Pa.

7

C.S.A. § 3323, Officers Kling and Nestel had reasonable suspicion to conduct the traffic stop of Defendant's vehicle. *See, e.g.*, *United States v. Cann*, Criminal Action No. 16-309, 2017 WL 1739562, at *3 (E.D. Pa. May 3, 2017) (concluding that the initial traffic stop was lawful under the Fourth Amendment, where the vehicle in which the defendant was a passenger was stopped for two traffic violations, the first being that the driver failed to obey a stop sign); *United States v. Oritz*, Criminal Action No. 16-129, 2016 WL 5661712, at *2 (E.D. Pa. Sept. 30, 2016); *United States v. Wolford*, No. CR. 08-29, 2010 WL 4363871, at *6 (W.D. Pa. Oct. 27, 2010).

Moreover, prior to initiating the traffic stop, the Officers ran the license plate number, and learned there was no vehicle registration associated with Defendant's vehicle, which is a separate violation of the Motor Vehicle Code. *See* 75 Pa. C.S.A. § 1301(a) (prohibiting driving an unregistered vehicle); *United States v. Mundy*, 621 F.3d 283, 289 (3d Cir. 2010). Thus, this was yet another basis for the traffic stop. *See, e.g.*, *United States v. Mosley*, No. CR.A. 01-664, 2002 WL 32351168, at *2 (E.D. Pa. Sept. 18, 2002).

### B. *The Search and Seizure*

As "[t]he Supreme Court has repeatedly recognized," "traffic stops are dangerous encounters that result in assaults and murders of police officers." *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997) (citations omitted). It is well-settled that a police officer executing a valid traffic stop "may exercise reasonable superintendence over the car and its passengers." *Bonner*, 363 F.3d at 216. Thus, after a car has been legally stopped, "the police may 'escalate' the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants." *Mosley*, 454 F.3d at 252.

As a preliminary matter, Officers Nestel and Kling were permitted to question Defendant and order Defendant out of his vehicle. *See, e.g.*, *United States v. Yamba*, 407 F. Supp. 2d 703,

708 (W.D. Pa. 2006), *aff'd*, 506 F.3d 251 (3d Cir. 2007) (explaining that two Supreme Court cases, *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) and *Maryland v. Wilson*, 519 U.S. 408 (1997), "demonstrate that a police officer may order the driver and passengers to exit the vehicle while the stop is being conducted"); *United States v. Bellinger*, 343 F. Supp. 2d 417, 419 (E.D. Pa. 2004), *aff'd*, 284 F. App'x 966 (3d Cir. 2008) (same).

Moreover, a police officer "may pat down the occupants of the vehicle and conduct a search of the passenger compartment, if he has a reasonable suspicion that the occupants might be armed and dangerous." *Bonner*, 363 F.3d at 216; *see also United States v. Colen*, 482 F. App'x 710, 711 (3d Cir. 2012) ("[W]here—as here—police conduct a valid traffic stop[,] they may conduct a limited search for weapons by patting-down the driver and/or occupants of the stopped vehicle for their own protection."); *United States v. Goode*, 486 F. App'x 261, 264 (3d Cir. 2012) ("[T]he police only needed a reasonable suspicion that they were dealing with an armed and dangerous individual to permit a reasonable search for weapons." (quotation marks and citations omitted)); *Yamba*, 407 F. Supp. 2d at 708 ("Moreover, the Court of Appeals for the Third Circuit has recognized that . . . many courts of appeals have upheld limited weapon pat-downs of passengers where the passengers have engaged in suspicious behavior." (citation omitted)).

The officer must be able to identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Moorefield*, 111 F.3d at 11 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). In assessing whether reasonable suspicion exists, this Court must consider the totality of the circumstances (i.e., the whole picture). *See, e.g.*, *Colen*, 482 F. App'x at 712; *Goode*, 486 F. App'x at 264. The Third Circuit has recognized that "[c]ourts give considerable deference to police officers' determinations of

reasonable suspicion." *Mosley*, 454 F.3d at 252. One factor courts have considered in assessing whether officers have reasonable suspicion is whether other occupants of the vehicle possess weapons or other potentially dangerous implements such as body armor. *See Bellinger*, 343 F. Supp. 2d at 420; *see also United States v. Burton*, 532 F. App'x 171, 174 (3d Cir. 2013); *United States v. Richardson*, Crim. No. 15-0176, 2016 WL 223705, at *4 (D.N.J. Jan. 19, 2016); *cf. United States v. Murphy*, 402 F. Supp. 2d 561, 566 (W.D. Pa. 2005) (finding that passenger's flight from a vehicle stop contributed to a reasonable suspicion that the driver may have been armed and dangerous).

*United States v. Bellinger* is illustrative of this point. In that case, Philadelphia police officers pulled over a car with an illegal window tint because it matched the description of a vehicle that they believed had been "involved in a rash of prior robberies and aggravated assaults." *Bellinger*, 343 F. Supp. 2d at 418.[10] In addition to the driver, there were two passengers in the vehicle; one sitting in the front seat and the other sitting in the rear seat. *Id.* The rear seat passenger was directed to exit the vehicle; as he was complying, "a gun fell from his pant leg." *Id.* The officers ordered the remaining two occupants out of the vehicle out at gunpoint. *Id.* While these two men were lying on the ground handcuffed, one of the officers looked into the car and spotted the butt of a gun protruding from underneath the front passenger seat. *Id.* The front passenger was charged with illegal possession of that gun, and moved to suppress it. *Id.* The court denied the motion to suppress, reasoning that the officers were

---

[10] The Court recognizes that, in one respect, the facts of *Bellinger* are distinguishable from those of this case, as Officers Kling and Nestel had no reason to suspect—and did not suspect—that Defendant's vehicle had been involved in a robbery. (*See* Hr'g Tr. at 59:14–60:5.) However, *Bellinger* is similar to this case in that, in both cases, the fact that one occupant of the vehicle had a gun gave the officers reasonable suspicion that the other occupants of the vehicle were armed and dangerous—a fact that Defendant fails to acknowledge when he argues that "the government did not present any evidence that police had a reasonable believe [sic] that Mr. Gallman was a danger to them." (Doc. No. 30 at p. 7.)

10

allowed to order the men out of the car and that, once they had done so, were allowed to seize the gun, which was in plain view. *Id.* at 419–20.

So too here. The Court finds Officers Kling and Nestel testimony is credible and they identified "specific and articulable facts which, taken together with rational inferences from those facts," show that the officers had reasonable suspicion to believe an occupant in the vehicle was armed and dangerous. First, the officers testified that, based on their years of experience, they had personal knowledge that the location of the stop (i.e., where they pulled Defendant and Kelly-Sizer over) was a high-crime area. (Hr'g Tr. at 20:19–22:7, 63:10–25, 89:13–18.) Second, the officers' concern was heightened when, prior to approaching the vehicle, they saw Defendant turn his shoulders to the left and reach his right hand across his body, and the passenger, Kelly-Sizer, slide down in his seat towards the right. (*Id.* at 22:24–24:2, 88:18–22.) These movements raised the officers' level of concern for their safety, especially given the fact there was no registration associated with the vehicle. (*Id.* at 24:3–25:1.) Third, Defendant's response of "Why?" when asked whether he had a license to carry or if there were any weapons in the vehicle, differed from the typical "yes or no" answer to this routine question and added to the Officers' concern for their safety. (*Id.* at 26:2–21.) Fourth, Officer Nestel recovered from Kelly-Sizer's person a loaded handgun and an additional loaded magazine. (*Id.* at 27:7–13, 90:7–91:2, 91:12–14, 91:20–22.) Based on these facts, Officer Kling was more than justified in removing Defendant from the vehicle, conducting a quick pat down and handcuffing him. *See Bellinger*, 343 F. Supp. 2d at 420; *see also Burton*, 532 F. App'x at 174.

Although Defendant refers to Officer Kling's seizure of the firearm from the open driver's side door as a "search," the Court disagrees. (*E.g.*, Doc. No. 30 at pp. 7, 11.) After Officer Kling passed Defendant off to Officer Rosinski, Officer Kling returned to Defendant's

11

vehicle and looked in the open driver's side door. (*Id.* at 29:1–30:5.) Officer Kling immediately saw a handgun in the area between the driver's seat and the vehicle's B column. (*Id.*) Officer Kling seized the firearm.

Pursuant to the plain view doctrine Officer Kling was permitted to seize this firearm. Under the plain view exception to the warrant requirement, police may lawfully seize contraband without a warrant if they "are lawfully in a position from which they view [the] object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—i.e., its incriminating character is not immediately apparent—the plain-view doctrine cannot justify its seizure." *Id.* Here, Officer Kling credibly testified that he could see the firearm as he stood beside the open driver's side door (i.e., the gun's incriminating nature was immediately apparent from Officer Kling's lawful position).[11]

Finally, Defendant argues that the loaded magazine recovered from the backseat of the patrol car where Defendant was seated should also be suppressed as the fruit of Officer Kling's unlawful arrest and search. (*See* Doc. No. 30 at p. 11.) Because Defendant was lawfully detained,[12] the magazine recovered from the back of the patrol car where Defendant was seated

---

[11] In his supplemental memorandum, Defendant notes that Officer Kling admitted the 2800 block of Huntingdon was not well lit by street lights and he had to use his flashlight to see (Doc. No. 30 at p.6 (internal citation omitted)); however, Defendant fails to acknowledge that Officer Kling also turned on the side spotlight and the bright white light on his police vehicle in order to illuminate Defendant's vehicle during the traffic stop. (Hr'g Tr. at 22:14–17.) Additionally, the use of a flashlight is of no moment to the plain view analysis. "An officer may use a flashlight in conducting a plain view search." *Verdier v. Borough*, 796 F. Supp. 2d 606, 628 (E.D. Pa. 2011) (citing *United States v. Rickus*, 737 F.2d 360, 367 n.3 (3d Cir. 1984)). And, even if an officer's use of a flashlight did vitiate plain view, it would not matter here: Officer Kling testified that he saw the firearm at issue "without even having to use [his] flashlight." (Hr'g Tr. at 29:3–19.)

[12] Defendant argues that the officers removing him from his vehicle and handcuffing him was an "arrest," whereas the government characterizes it as a *Terry* stop. (*Compare* Doc. No. 30 at p. 10, *with* Doc. No.

is not the fruit of an unlawful search or seizure, and will not be suppressed.

### C. The Arrest

Last, Defendant contends that his constitutional rights were violated when he was arrested. (Doc. No. 22 at p. 2; Doc. No. 30 at p. 1.) We disagree.

"A warrantless public arrest does not violate the Fourth Amendment 'where there is probable cause to believe that a criminal offense has been or is being committed.'" *United States v. Johnson*, Criminal Action No. 05-440, 2007 WL 2916157, at *4 (E.D. Pa. Oct. 5, 2007) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)); *see also United States v. Reid*, 185 F. App'x 208, 210–11 (3d Cir. 2006) ("Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person to believe an offense has been committed."). "To determine whether an officer had probable cause to arrest an individual, a court must 'examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Johnson*, 2007 WL 2916157, at *4 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

Here, the Court concludes that Officer Kling had probable cause to arrest Defendant when he saw the firearm in plain view next to Defendant's driver's seat area. *See United States v. Bond*, 173 F. App'x 144, 146–47 (3d Cir. 2006) (affirming defendant's § 922(g)(1) conviction and the district court's denial of the defendant's motion to suppress, and holding that the officers

---

31 at p. 4.) The Court "do[es] not need to decide whether these actions constituted a full-fledged arrest of [Defendant] or merely an investigatory stop under *Terry*. Under *Mimms* and *Wilson*, [Officer Kling] could order [Defendant] out of the car without violating the Fourth Amendment. Once [Defendant] was out of the car, the . . . gun was in plain view through the open door from outside of the car. Therefore, the gun was not seized in violation of the Fourth Amendment." *Bellinger*, 343 F. Supp. 2d at 420. Neither was the loaded magazine subsequently recovered from the back of the patrol car where the Defendant was seated.

had probable cause to arrest the defendant as soon as they "observed [him] in possession of a firearm on a public street in Philadelphia").

## V.    Conclusion

For the foregoing reasons, the Court denies Defendant's motion to suppress.

An appropriate Order follows.